WHANN v. HUFTY, Sheriff, et al.

The right of a plaintiff in attachment to follow the property attached into the hands of third persons who have acquired rights from the owner after the attachment, depends on the reality of the Sheriff's possession under the attachment.

The possession of the keeper appointed by the plaintiff is the possession of the Sheriff, but if the plaintiff in the attachment is himself the keeper and suffers the property attached to be taken out of his possession and carried to a distant parish from his own residence, where it is sold without any steps having been taken to regain the possession, he cannot disturb the title of the purchaser.

APPEAL from the Second District Court of New Orleans, *Morgan*, J. *M. M. Cohen*, for plaintiff and appellant. *George L. Bright*, for defendants.

BUCHANAN, J. *Randall McGavock*, one of the defendants, brought suit against *James R. Christian*, in the District Court of Iberville parish, by attachment, for money paid to and for the use of *Christian's* wife, who was the daughter of *McGavock*.

This suit was brought and the attachment levied on the 15th November, 1854, on a slave named *Mary*, as the property of the defendant *Christian*. The Sheriff's return of the writ of attachment is "Executed by *seizing and attaching*," &c. It does not say, in so many words, that he had taken possession of this slave; but we may infer that he did so, because it is proved by a witness, introduced by *McGavock*, that the latter was in possession of the slave in November, 1854, *as keeper appointed by the Sheriff*. On the 27th of April, 1855, judgment was entered up in the District Court of Iberville, (which was,

however, only signed on the 14th February 1856,) in favor of *McGavock* against *Christian*, for the sum of two hundred and seventy-five dollars and sixteen cents; "and that the slave attached be seized and sold to satisfy judgment and costs." Some time in the interval between the rendition of the judgment and its signature, *Mrs. Christian*, daughter of defendant, *McGavock*, who was living at her father's house, when the suit was instituted by him against her husband, came from thence to New Orleans to the house of *Philo H. Goodwyn*, accompanied by the slave *Mary* as a nurse. *Philo H. Goodwyn* was married to another daughter of defendont *McGavock*. After staying some time with her sister, *Mrs. Goodwyn*, *Mrs. Christian* left to go to her husband, in the parish of Iberville, a reconciliation having taken place between herself and her husband, who, it should have been mentioned, was living in Tennessee when his father-in-law brought suit against him, but had returned to Louisiana pending that suit, in which he made a personal appearance and defence. The night before *Mrs. Christian* left Mr. *Goodwyn's* house, the slave *Mary* ran away, and told *Goodwyn*, when found, that she was willing to stay with any one who would purchase her in the city, but would not return to the country. Whereupon, at the instance of *Goodwyn*, negotiations were set on foot for the sale of the slave *Mary*, between *Christian* and the plaintiff, a resident of New Orleans, through *James M. Putnam*, a merchant of New Orleans, and the holder of a mortgage upon the slave.

The slave *Mary* was left in plaintiff's possession, on trial, for a month previous to the day of sale. The proposed sale of the slave by *Christian* to plaintiff was a matter of notoriety in the family; and defendant *McGavock* was informed of it in a letter by *Goodwyn*. *McGavock* replied to this information, that he did not care what *Christian* did with the girl, but that, if he got judgment, he would seize her.

A power of attorney to sell the girl was sent at first by *Christian* to *Goodwyn*, but *Goodwyn* declined to act, *knowing the difficulty that existed*. *Christian* then made his special power of attorney to *Putnam*, of date the 26th July, 1855, under which the latter sold the slave *Mary* to plaintiff on the 30th July, 1855, for nine hundred dollars cash.

*Putnam* testifies that he was on the 30th July, the agent of defendant, *McGavock*, in this city; that up to the date of the sale, *McGavock* did not inform him that he had a claim against this slave *Mary*, which, as agent for *Christian*, the witness sold to *Whann*. Had witness known that there was a claim on the part of *McGavock* against *Christian* on the slave *Mary*, he would not have passed the act. And *Goodwyn* states that *Whann* consulted him about the title before making the purchase; and admits that, although he knew of the attachment, he concealed it from *Whann*. After this sale *Whann* remained in possession of the slave *Mary* until the 7th March, 1856, when the Sheriff of the parish of Orleans seized her in his hands, under a *fi. fa.* directed to him from the District Court of Iberville, in the suit of *McGavock* v. *Christian*, by the express written instructions of *McGavock*. The plaintiff has injoined the sale.

Under the above state of facts, respecting which there is no contrariety of evidence whatever, the claim of *McGavock* to make the slave *Mary* liable in execution of his judgment, has as little foundation in law as in equity. There is no doubt that property claimed in a lawsuit cannot be alienated or incumbered pending the proceedings, to the prejudice of the plaintiff or claimant.

36

WHANN
*v.*
HUFTY.

See C. C. 2428, and the case of *Gillespie* v. *Cammack*, 3d Annual. But the right of plaintiff in attachment to follow the property attached into the hands of third persons, who have acquired rights from the owner after the attachment, depends upon the reality of the Sheriff's possession under the attachment, see *Goodrich* v. *Pattengill*, 7 An. 664. And we take it also to be correct doctrine that the possession of the keeper appointed by the Sheriff is the possession of the Sheriff. But when, as in the present case, that keeper is the plaintiff in attachment himself, who suffers the property attached to be taken out of his possession by the wife of the defendant into a parish distant from his own residence, and there to remain for months, while the defendant is openly, and to his perfect knowledge, offering it for sale, and finally sells it without the plaintiff in attachment interposing any obstruction or taking any steps to regain possession, as keeper, for the Sheriff, although he had ample opportunity to do so ; the case is clearly within the rule of the Roman law quoted by Judge Story in paragraph 394 of his Commentaries on Equity Jurisprudence—" *creditor, qui permittit rem venire, pignus dimittit.*" See also paragraph 385 of the same work, and *Marsh* v. *Smith*, 5 Rob. 523.

It is, therefore, adjudged and decreed, that the judgment of the District Court be reversed ; and that the injunction herein be perpetuated, the defendant and appellee, *Randall McGavock*, to pay the costs of both courts.